**Linda REEVES, Plaintiff**

v.

**Jo Anne B. BARNHART, Commissioner of the Social Security Administration, Defendant**

**No. CIV. 02–30063–KPN.**

United States District Court, D. Massachusetts.

May 12, 2003.

Sandra L. Smales, Boston, MA, for Linda E. Reeves, Plaintiff.

Karen L. Goodwin, United States Attorney's Office, Springfield, MA, for Jo Anne Barnhart, Commissioner of the Social Security Administration, Defendant.

*MEMORANDUM AND ORDER WITH REGARD TO PLAINTIFF'S MOTION TO REVERSE and DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER (Document Nos. 15 and 18)*

NEIMAN, United States Magistrate Judge.

This matter is before the court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3),

which provide for judicial review of a final decision by Defendant, the Commissioner of the Social Security Administration ("Commissioner"), regarding Linda Reeves ("Plaintiff")'s entitlement to disability benefits. Plaintiff alleges that the Commissioner's decision denying her Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") disability benefits—memorialized in an August 29, 2001 decision by an administrative law judge—is not supported by substantial evidence and is predicated on errors of law. Plaintiff has moved to reverse or remand the decision and the Commissioner, in turn, has moved to affirm.

With the parties' consent, this matter has been reassigned to the undersigned pursuant to 28 U.S.C. § 636(c) for all purposes, including entry of judgment. For the reasons set forth below, Plaintiff's motion to reverse will be denied and the Commissioner's motion to affirm will be allowed.

### I. STANDARD OF REVIEW

A court may not disturb the Commissioner's decision if it is grounded in substantial evidence. *See* 42 U.S.C. §§ 405(g) and 1383(c)(3). Substantial evidence is such relevant evidence as a reasonable mind accepts as adequate to support a conclusion. *Rodriguez v. Sec'y of Health & Human Servs.,* 647 F.2d 218, 222 (1st Cir.1981). The Supreme Court has defined substantial evidence as "more than a mere scintilla." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Thus, even if the administrative record could support multiple conclusions, a court must uphold the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [her] conclusion." *Irlanda Ortiz v. Sec'y of Health & Human Servs.,* 955

F.2d 765, 769 (1st Cir.1991) (citation and internal quotation marks omitted).

To be sure, the resolution of conflicts in evidence and the determination of credibility are for the Commissioner, not for doctors or the courts. *Rodriguez,* 647 F.2d at 222; *Evangelista v. Sec'y of Health & Human Servs.,* 826 F.2d 136, 141 (1st Cir. 1987). A denial of benefits, however, will not be upheld if there has been an error of law in the evaluation of a particular claim. *See Manso–Pizarro v. Sec'y of Health & Human Servs.,* 76 F.3d 15, 16 (1st Cir. 1996). In the end, the court maintains the power, in appropriate circumstances, "to enter ... a judgment affirming, modifying, or reversing the [Commissioner's] decision." 42 U.S.C. § 405(g).

### II. BACKGROUND

Plaintiff, born on January 19, 1964, is a high school graduate who attended, but did not finish, college. (Administrative Record ("A.R.") at 23, 46.) Her employment history consists of work as a nutritional counselor, certified nurse's aide, dental assistant, receptionist and cashier. (A.R. at 114, 138.) She lives with her husband and two children, ages seven and nine, in Plainfield, Massachusetts. (A.R. at 91, 93, 99.)

### A. MEDICAL HISTORY

Plaintiff's inability to work purportedly commenced on January 13, 1998, when she was involved in a car accident. (A.R. at 26, 89.) The main impairments which she claims to be disabling are neck and back pain, weakness and headaches. (See A.R. at 24, 29, 89.) Plaintiff states that these injuries impair her ability to work because the pain, which radiates down both arms and legs, limits her mobility and ability to function. (See A.R. at 24–30.) Plaintiff also maintains that her ability to stand or sit is substantially compromised when the pain is most severe. (See A.R. at 25.)

Plaintiff was involved in two other motor vehicle accidents prior to January 13, 1998, one in April of 1995, and the other shortly thereafter in May of 1995. (A.R. at 26.) Following the April accident, Plaintiff was treated by Dr. Eric Thompson. (A.R. at 305.) He concluded that Plaintiff had mild cervical spine tenderness and a limited range of motion in her neck, but he found no specific neurologic abnormality of motor or sensory functions. (*Id.*) X-rays of Plaintiff's cervical spine were negative. (A.R. at 175–76.) Dr. Thompson prescribed a soft cervical collar, analgesics and muscle relaxant medication. (A.R. at 305.)

Following the second car accident in May of 1995, Plaintiff was diagnosed with a mid and low back sprain as well as an acute cervical strain. (A.R. at 164, 302.) Plaintiff continued her treatment with Dr. Thompson who found that she had aggravated her prior cervical strain, but that her cervical spine radiographs appeared to be within normal limits. (A.R. at 302.) Thereafter, Plaintiff was prescribed and followed a course of physical therapy, but without relief. (See A.R. at 177–79.) In August of 1995, Dr. Thompson thought that Plaintiff's prognosis was "poor for return to full function" and that her condition was "well on its way to becoming a troublesome chronic pain syndrome." (A.R. at 298.)

Later that year, in December, Plaintiff was examined by Paul Sayour, a chiropractor. (A.R. at 177–79.) Dr. Sayour found that Plaintiff's subjective complaints were consistent with cervical hyper-flexion, hyper-extension injury, lumbar facet syndrome and rib strain. (A.R. at 178–79.) Plaintiff thereafter underwent a course of chiropractic treatment consisting of manipulation, electric muscle stimulation and hot packs. (A.R. at 179.)

As indicated, Plaintiff was involved in a third accident on January 13, 1998, and claims that date as the onset of her disability. (See A.R. at 89.) She was initially treated for her injuries at Berkshire Medical Center where a physical examination revealed diffuse tenderness, but neurological and vascular examinations were normal and x-rays showed no fracture or subluxation. (See A.R. at 219–23.) Dr. Andrew Plager diagnosed a cervical strain with possible radiculopathy. (A.R. at 222.) Plaintiff was offered, but declined, analgesics. (*Id.*)

Shortly thereafter, on January 19, 1998, Plaintiff was again seen by Dr. Thompson. (A.R. at 295.) Plaintiff reported that, although her symptoms had gradually improved with chiropractic treatment before the third automobile accident, she was "back to square one." (*Id.*) Dr. Thompson noted that it was difficult to examine Plaintiff because she was very reluctant to move her head. (*Id.*) However, he was able to notice diffuse tenderness of most of her paracervical muscles, although he did not find any serious structural injuries. (*Id.*) Nor did Dr. Thompson find any objective neurologic abnormalities in Plaintiff's upper and lower extremities. (*Id.*)

From January to May of 1998, Plaintiff underwent chiropractic treatment with Dr. Anna Rowinski. (See A.R. at 209–18.) While Plaintiff's symptoms varied over the course of this treatment, her headaches and back pain were consistent. (See *id.*) Also, from February of 1998 through July of 1999, Plaintiff underwent a course of myotherapy with Carolyn Dutcher. (A.R. at 233–50.) While that treatment gave Plaintiff some relief, her complaints of pain, spasms and headaches persisted. (See *id.*)

In April of 1998, Dr. Rowinski referred Plaintiff to Dr. Robert Van Uitert for a neurological consultation. (A.R. at 186.)

Dr. Van Uitert diagnosed a twisting injury of the back and whiplash injury of the neck. (A.R. at 187.) Although electromyography ("EMG") and nerve testing by Dr. Van Uitert were consistent with certain degenerative changes, a subsequent magnetic resonance imaging ("MRI") of Plaintiff's cervical spine proved normal. (A.R. at 186–87.) Subsequent EMG and nerve conduction studies in December of 1998 were similarly normal. (See A.R. at 188–90.) Dr. Van Uitert noted that, other than natural medications prescribed by Dr. Rowinski, Plaintiff had chosen to avoid medicine in favor of myotherapy and chiropractic care. (A.R. at 186.)

On November 21, 1999, Dr. James Kerner, another chiropractor, performed an examined Plaintiff at the request of her lawyer. (A.R. at 195.) Dr. Kerner noted symptoms and impairments similar to those previously identified. (See A.R. at 195–205.) Following an American Medical Association guide for evaluation of permanent impairment, Dr. Kerner ascribed numerical values to Plaintiff's impairments and their effect on her functioning in daily life. (See *id.*) He assessed a forty percent total combined permanent impairment. (A.R. at 204.)

On April 12, 2000, in conjunction with her application for disability benefits, Plaintiff was examined by Dr. Daniel Dress, an internist and consultant for the Massachusetts Disability Determination Services ("DDS"). (A.R. at 224–26.) Dr. Dress noted a limited range of motion in Plaintiff's neck, back, shoulders and arms, assessed Plaintiff's back, neck and shoulder pain and opined that Plaintiff "might have difficulty with lifting and bending." (A.R. at 225–26.)

Shortly thereafter, on April 21, 2000, Plaintiff went to the emergency room complaining of neck and back pain. (A.R. at 256.) X-rays found no fracture or subluxation, but showed minor degenerative changes. (A.R. at 287.) Plaintiff refused medication and, instead, was prescribed heat, frequent massage and Motrin. (A.R. at 256–57.) The following month, on May 26, 2000, Plaintiff visited the emergency room again for similar complaints of pain. (A.R. at 255.) Toradol, which was prescribed for Plaintiff, provided her with good relief from spasms and allowed her to move, sit up and comfortably talk. (*Id.*) Plaintiff was then referred to a neurologist. (*Id.*)

The neurologist, Dr. John O'Connell, examined Plaintiff five times from June 15, 2000, through May 29, 2001. (A.R. at 314–15, 346, 362.) In June and August of 2000, Dr. O'Connell found no evidence of structural abnormality and felt that Plaintiff's primary problem was pain. (A.R. at 314–15.) He intended to recommend chronic pain medication, but Plaintiff did not want to take any long-term medications. (*Id.*) In November and again in February 2001, Dr. O'Connell reported an unremarkable examination, despite Plaintiff's continued complaints of pain, and recommended that she maintain myotherapy and chiropractic treatment and that she take an hour every day to relax, walk and swim. (A.R. at 346.) Plaintiff reported that the myotherapy and chiropractic treatment helped, but that swimming made the pain worse. (*Id.*) Dr. O'Connell saw Plaintiff for the last time on May 29, 2001, and noted no improvement. (A.R. at 362.) An MRI performed at that time showed evidence of neural foraminal narrowing and arthritis, but no significant nerve impingement. (*Id.*) Dr. O'Connell recommended continued exercise in the form of walking to help with Plaintiff's pain. (*Id.*)[1]

---

**1.** Dr. O'Connell also referred Plaintiff to a psychological member of an outreach team

Meanwhile, on April 9, 2001, Dr. Rowinski stated that, during her course of chiropractic treatment, Plaintiff showed a pattern of severe muscle rigidity which resulted in a decreased range of motion in her neck and back. (A.R. at 344–45.) Dr. Rowinski concluded that Plaintiff was unable to perform sedentary work on a sustained and consistent basis due to severe pain and unpredictable episodes of weakness. (*Id.*)

On April 25, 2000, Dr. W.P. Straub, a DDS physician, completed a physical residual functional capacity ("RFC") assessment. (A.R. at 332–37.) Dr. Straub concluded that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently; sit, stand and walk for about six hours in an eight hour day; and had otherwise unlimited capabilities to push and pull. (A.R. at 333.) Dr. Straub also found that Plaintiff had a limited ability to reach, but could climb occasionally and balance, stoop, kneel, crouch and crawl frequently. (A.R. at 334–35.) On September 1, 2000, Dr. Avad Ramachandra, another DDS physician, completed an RFC assessment and reached conclusions similar to those of Dr. Straub, although he found that Plaintiff could climb frequently rather than occasionally. (See A.R. at 323–30.)

## B. Procedural History

On March 16, 2000, in the midst of these medical benchmarks, Plaintiff applied for disability benefits. (A.R. at 89–92.) On April 28, 2000, the Social Security Administration denied the application because Plaintiff's condition, which was found to prevent her from doing past work, did not prevent her from performing other gainful activities. (A.R. at 369.) On September 7, 2000, upon Plaintiff's request for reconsid-

for chronic pain treatment. (A.R. at 314.) That visit, however, was not covered by insur-

eration, the agency concluded that Plaintiff actually had the ability to return to her past job. (A.R. at 376.) Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which was held on July 13, 2001. (A.R. at 21.)

After reviewing the evidence of record, the ALJ concluded on August 29, 2001, that Plaintiff was not eligible for disability benefits. (A.R. at 18.) Plaintiff's request for review by the Appeals Council was denied on February 12, 2002, thereby making the ALJ's decision the final decision of the Commissioner. (A.R. at 6–7.)

## C. Disability Standard and the ALJ's Decision

An individual is entitled to SSDI and SSI, if, among other factors, she suffers from a disability. *See* 42 U.S.C. §§ 423 and 1382(c). A disability is defined as the inability to engage in any substantial gainful activity by reason of an impairment expected either to result in death or has lasted for a continuous period of at least twelve months. *See* 42 U.S.C. §§ 416(i)(1)(A) and 423(d)(1)(A). A claimant is considered disabled under the Social Security Act

only if [her] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work.

ance and, therefore, apparently never took place. (See A.R. at 346.)

42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). *See generally Bowen v. Yuckert,* 482 U.S. 137, 146–49, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

■ In determining disability, the Commissioner follows the five-step protocol described by the First Circuit as follows:

First, is the claimant currently employed? If [s]he is, the claimant is automatically considered not disabled.

Second, does the claimant have a severe impairment? A "severe impairment" means an impairment "which significantly limits the claimants physical or mental capacity to perform basic work-related functions." If [s]he does not have an impairment of at least this degree of severity, [s]he is automatically considered not disabled.

Third, does the claimant have an impairment equivalent to a specific list of impairments contained in the regulations' Appendix 1? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled.

. . . . .

Fourth, . . . does the claimant's impairment prevent [her] from performing work of the sort [s]he has done in the past? If not, [s]he is not disabled. If so, the agency asks the fifth question.

Fifth, does the claimant's impairment prevent [her] from performing other work of the sort found in the economy? If so, [s]he is disabled; if not, [s]he is not disabled.

*Goodermote v. Sec'y of Health & Human Servs.,* 690 F.2d 5, 6–7 (1st Cir.1982).[2]

In the instant case, the ALJ found it necessary to answer the first four questions only. The ALJ determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset of her disability (question one); that she had an impairment or a combination of impairments considered "severe," although not severe enough to be listed in Appendix 1 (questions two and three); but that Plaintiff's medically determinable impairments involving her back, neck, arms, legs, and headaches did not prevent her from performing her past relevant work (question four). (A.R. at 17.) As a result, the ALJ concluded that Plaintiff did not suffer from a disability. (*Id.*)

### III. *Discussion*

Plaintiff challenges the ALJ's decision in two ways. First, Plaintiff asserts that the ALJ's reliance on Dr. Straub, a non-examining DDS physician, is not supported by substantial evidence and is improper as a matter of law. Second, Plaintiff argues that the ALJ failed to evaluate Plaintiff's subjective complaints of pain in accordance with applicable law. In response, the Commissioner argues that the ALJ's reliance on Dr. Straub and refusal to fully credit Plaintiff's subjective complaints are supported by substantial objective medical evidence. For the reasons which follow, the court finds the Commissioner to have the stronger argument.

### A. *Treating Versus Non-treating Physicians*

Plaintiff first contends that the ALJ erred by "adopting" the consultative opin-

---

**2.** With respect to SSDI, an individual must also demonstrates that she is under a disability prior to the date her insurance status expired. *See* 42 U.S.C. § 423(a)(1)(A); *Torres v. Sec'y of Health & Human Servs.,* 845 F.2d 1136, 1138 (1st Cir.1988). Eligibility for SSI benefits, on the other hand, is not dependent upon insured status, but a claimant must prove that she is needy. *See* 42 U.S.C. § 1382(a). Neither Plaintiff's insured status nor her need have been put at issue here.

ion of Dr. Straub, a non-treating physician, over the opinions of her many treating physicians, in particular Dr. Rowinski, her chiropractor. The court disagrees.

In determining whether a claimant retains the residual functional capacity to perform the requirements of her past relevant work, an administrative law judge must consider any medical opinions from acceptable medical sources which reflect judgments about the nature and severity of the impairments and resulting limitations. *See* 20 C.F.R. §§ 404.1527 and 416.927 (2003). State agency physicians are experts in the evaluation of the medical issues in disability claims, and administrative law judges must evaluate their findings as they do other opinion evidence. *See* 20 C.F.R. §§ 404.1527(f) and 416.927(f) (2003).

To be sure, the First Circuit once held that the advisory report of a non-testifying, non-examining doctor could not, in and of itself, "be the substantial evidence needed to support a finding." *Browne v. Richardson*, 468 F.2d 1003, 1006 (1st Cir.1972). The court was concerned that such a report "lack[ed] the assurance of reliability that comes on the one hand from first-hand observation and professional examination or, on the other, from first-hand testimony subject to claimant's cross-examination." *Id.* Subsequently, however, the First Circuit clarified "that the principle enunciated in *Browne* is by no means an absolute rule." *Lopez v. Sec'y of Health & Human Servs.*, 951 F.2d 427, 431 (1st Cir.1991) (citation omitted). "To the contrary," the First Circuit explained, an advisory report of a non-examining, non-testifying physician "is entitled to evidentiary weight, which 'will vary with the circumstances, including the nature of the illness and the information provided the expert.'" *Berrios Lopez*, 951 F.2d at 431 (quoting *Rodriguez*, 647 F.2d at 223).

■ In the instant case, the ALJ reasonably relied upon the opinion of Dr. Straub, among others, in assessing Plaintiff's residual functional capacity. In the court's view, Dr. Straub's opinion was supported by the objective medical evidence, including evidence provided by Plaintiff's treating and examining physicians, and was not inconsistent with other medical evidence of record. In contrast, as the Commissioner points out, the opinions of Plaintiff's treating physicians which might arguably support her disability claim are, for the most part, based on Plaintiff's own descriptions of pain and lack objective medical findings.

For example, Dr. Plager, examining Plaintiff shortly after the January 13, 1998 accident, diagnosed acute strain with possible radiculopathy, but subsequent x-rays showed no fracture or subluxation. (See A.R. at 221–23.) Similarly, Dr. Thompson found pain and tenderness upon examination, but ultimately concluded that Plaintiff showed no evidence of any serious structural abnormality. (See A.R. at 296.) Dr. Van Uitert, to whom Plaintiff was referred by one of her chiropractors, observed similar limitations based in part on Plaintiff's own complaints, but a subsequent MRI of the spine was normal. (A.R. at 194.) Moreover, Dr. O'Connell, who examined Plaintiff on a number of occasions, continually found no abnormalities on examination and, although an MRI showed evidence of neural foraminal narrowing and arthritis, found no evidence of nerve impingement. In the end, the residual functional capacity assessment of Dr. Straub, although not based upon an examining relationship with Plaintiff, is consistent with these unremarkable examinations and test results.

As to Plaintiff's contention that the ALJ improperly discredited the opinions of her treating physicians, the foregoing analysis makes clear that the opinions of those

physicians were in fact taken into account and, more often than not, are consistent with the ALJ's conclusions. For example, the ALJ specifically considered the MRI from Dr. O'Connell, but went on to address a later clarification of that MRI from Dr. Britton Limes. (A.R. at 14.) Dr. Limes stated that the foraminal narrowing could conceivably cause mild impingement upon any of the lumbar nerve roots, but made no conclusive statement to that effect; in fact, Dr. Limes stated that no significant displacement of nerve roots was identified at any level. (A.R. at 14, 363.)

Nonetheless, Plaintiff contends that, in particular, the RFC assessment provided by Dr. Rowinski, her chiropractor, should be afforded substantial weight as she had the most extensive contact with Plaintiff.[3] As support, Plaintiff relies on *Chester v. Callahan*, 193 F.3d 10 (1st Cir.1999), where the Commissioner's denial of similar benefits was purportedly reversed because a chiropractor's RFC assessment was not fully credited. *See id.* at 13.

There are several reasons why *Chester* does not support Plaintiff's cause. First, as Plaintiff recognizes, the opinions of chiropractors—described in the regulations as "other sources" of information (20 C.F.R. §§ 404.1513(d)(1) and 416.913(d)(1) (2003))—are not entitled to the same weight as those of "physicians and psychologists"—described in the regulations as "acceptable medical sources" (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2) (2003)). *See Lee v. Sullivan*, 945 F.2d 687, 691 (4th Cir.1991); *Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir.1991). Second, *Chester* is distinguishable because, other than the claimant's testimony, the "*only* remaining evidence concerning the claimant's exertional capacity [was] the chiropractor's RFC assessment." *Id.*, 193 F.3d at 13 (emphasis added). Here, in contrast, there was significant countervailing evidence of record from acceptable medical sources. Third, it is worth repeating that the determination of disability is reserved to the Commissioner, not to any particular treating source. *See* 20 C.F.R. §§ 404.1527(e)(1) and 416.927(e)(1) (2003). *See also Arroyo v. Sec'y of Health & Human Servs.*, 932 F.2d 82, 89 (1st Cir.1991) (finding ALJ not required to accept conclusions of claimant's treating physicians on ultimate issue of disability); *Sitar v. Schweiker*, 671 F.2d 19, 22 (1st Cir.1982) (finding physician's conclusions with respect to the ultimate question of disability not binding on hearing examiner).

### B. SUBJECTIVE COMPLAINTS OF PAIN

 Plaintiff's second argument—that the ALJ failed to properly evaluate Plaintiff's subjective complaints of pain—can be disposed of in relatively short order. In *Avery v. Sec'y of Health & Human Servs.*, 797 F.2d 19 (1st Cir.1986), the First Circuit established a road map for evaluating a claimant's subjective complaints of pain.[4] As the court observed, "[p]roper consideration of the effect of

---

**3.** In particular, Plaintiff points to Dr. Rowinski's opinion that Plaintiff's chronic pain and fatigue, as well as unpredictable episodes of profound weakness and severe pain, placed extreme limitations on her ability to function at home and at work, and that she was unable to perform any sedentary work on a sustained and consistent basis. (See A.R. at 209–18.)

**4.** Technically, the *Avery* court adopted the Commissioner's pain policy outlined in the Social Security Administration's Program Operations Manual System (POMS), DI T00401.570, a copy of which was appended to the court's opinion. *Id.* 797 F.2d at 24. The appended policy, *id.* at 27–30, has consistently been referred to as a part of the *Avery* decision. *See, e.g., Musto v. Halter*, 135 F.Supp.2d 220, 226–27 (D.Mass.2001) (citing cases).

pain ... on an individual's ability to work is an important part of the disability evaluation process." *Id.* at 27 (quoting POMS T00401.570). The policy is grounded in the requirement that "there must be a clinically determinable medical impairment that can reasonably be expected to produce the pain alleged." *Id.* at 21. *See also Dupuis v. Sec'y of Health & Human Servs.,* 869 F.2d 622, 623 (1st Cir.1989) (while "complaints of pain need not be precisely corroborated by objective findings, ... they must be [at least] consistent with medical findings"). In essence, an administrative law judge must "obtain detailed descriptions of daily activities by directing specific inquiries about the pain and its effects to the claimant, his/her physicians from whom medical evidence is being requested, and other third parties who would be likely to have such knowledge." *Avery,* 797 F.2d at 23 (citations and internal quotation marks omitted). The administrative law judge must then consider the following: 1) the nature, location, onset, duration, frequency, radiation and intensity of pain; 2) any precipitating and aggravating factors; 3) the type, dosage, effectiveness and adverse side-effects of any pain medication; 4) any treatment, other than medication, for relief of pain; 5) functional restrictions; and 6) the claimant's daily activities. *See id.* at 24–25 (citing POMS DI T00401.570); *Musto,* 135 F.Supp.2d at 227.

To be sure, the First Circuit has long acknowledged that an administrative law judge is not required to take a claimant's subjective allegations at face value. *See Bianchi v. Sec'y of Health & Human Servs.,* 764 F.2d 44, 45 (1st Cir.1985) (citation omitted). Moreover, it is well established that the court must generally defer to credibility determinations made by an administrative law judge. *See Frustaglia v. Sec'y of Health & Human Servs.,* 829 F.2d 192, 195 (1st Cir.1987); *Brown v.*

*Sec'y of Health & Human Servs.,* 740 F.Supp. 28, 36 (D.Mass.1990). Still, a court must review an administrative law judge's determination to see if it comports with the law.

■ In the case at bar, Plaintiff maintains that the ALJ's finding—that her complaints of pain were exaggerated and not entirely credible in light of a lack of objective evidence and discrepancies between her assertions and the documentary reports and medical history—is not supported by the evidence. The court disagrees.

In the court's estimation, the ALJ properly considered *Avery* in light of Plaintiff's complaints and gave specific reasons for her credibility findings. The ALJ explicitly questioned Plaintiff concerning the *Avery* factors. She also considered those factors in her decision and specifically referenced Plaintiff's testimony in assessing Plaintiff's credibility. For example, after the ALJ questioned Plaintiff about her medication, her ways of relieving pain and her daily activities, Plaintiff testified that she

- took Ibuprofen and herbal supplements;

- used heat packs and body positioning to alleviate her pain; and

- led a very active lifestyle, i.e., she "home schooled" her children, took bike and library excursions, prepared meals twice, or even three, times a day, and did grocery shopping.

(A.R. at 15, 31–32, 35–42.) This evidence, together with the objective medical testimony or record, was found by the ALJ to be inconsistent with Plaintiff's subjective complaints of pain and provides substantial evidence to support the ALJ's credibility assessment.

IV. *CONCLUSION*

The ALJ's conclusion that Plaintiff is not disabled might not be the only possible result that could have been reached. Nonetheless, for the foregoing reasons, the court finds that the her decision is based on substantial evidence and not predicated on errors of law. *See Rodriguez Pagan v. Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir.1987) (a court must affirm the administrative decision so long as it is supported by substantial evidence, even if the record could arguably justify a different result). Accordingly, Plaintiff's motion is DENIED and the Commissioner's motion is ALLOWED.

IT IS SO ORDERED.